UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**RASHAWN FOREMAN**,                          Case No. 3:14 CV 1315
**ON BEHALF OF J.H.**,

       Plaintiff,                             Magistrate Judge James R. Knepp, II

   v.                                      MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

       Defendant.

## INTRODUCTION

Plaintiff Rashawn Foreman, on behalf of her minor child J.H., appeals the administrative denial of child supplemental security income ("SSI") benefits under 42 U.S.C. § 1383. The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

Plaintiff filed J.H.'s application for SSI on January 24, 2011, alleging a disability onset date of September 1, 2010. (Tr. 68, 147). Her application was denied initially (Tr. 68-75) and on reconsideration (Tr. 77-86). Plaintiff, represented by counsel, requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 97). Plaintiff, J.H., and Raymond Moore, M.D., a medical expert ("ME"), testified at the hearing, after which the ALJ found J.H. not disabled. (*See* Tr. 12-25, 30-65). The Appeals Council denied Plaintiff's request for review, making the hearing

decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On June 18, 2014, Plaintiff filed the instant case. (Doc. 1).

**FACTUAL BACKGROUND**

*Testimony and Personal Background*

Born September 1, 2005, J.H. was five years old and considered a preschooler on the date her SSI application was filed; however, she had reached the level of "school-age" by the time the ALJ made his decision on January 28, 2013. (Tr. 15, 25). 20 C.F.R. §§ 416.926a(h)(2), (i)(2).

Plaintiff alleged J.H.'s main problem was her behavior; she was destructive and had anger issues. (Tr. 35). J.H. bullied other children, including her siblings, acted out in public, talked back to adults, and broke things. (Tr. 35). Plaintiff stated her school was considering placing her in special education classes because of her behavior but, as of the hearing, she was still in regular classes. (Tr. 35). She reported J.H. went to counseling every two weeks and participated in a socialization group. (Tr. 41). J.H. also had problems paying attention and was often moody. (Tr. 43). Plaintiff stated she tried to keep J.H. away from other children, besides her siblings, because she did not want to create problems in the neighborhood. (Tr. 48).

Plaintiff admitted J.H. was released from care at Harbor Behavioral Health because she missed too many appointments, Plaintiff stated that due to her high risk pregnancy she could not make both her own appointments and J.H.'s. (Tr. 43). J.H. then received care at Unison where she was prescribed Adderall starting in October 2012, a few months before the hearing. (Tr. 44-45). Plaintiff reported that the Adderall wore off around 1:00 p.m., causing problems in the classroom, and so they increased J.H.'s dosage and it appeared to be helping her for a longer period. (Tr. 45-46). However, J.H. still had behavioral issues including yelling, talking out of turn, and putting her hands on others. (Tr. 46).

J.H. testified she sometimes did well in school but other times she did not. (Tr. 36). She stated she had eleven friends but admitted that she got in fights sometimes. (Tr. 37-38).

*Function Reports*

In a Function Report completed by Plaintiff in January 2011, she reported J.H. did not know her telephone number, could not define common words, and did not understand jokes. (Tr. 174). Plaintiff also reported multiple difficulties in interacting with others, lack of proper social skills such as sharing, and an inability to show affection. (Tr. 175). Plaintiff noted aggression towards both objects and others was a major difficulty with J.H., such that she could not find babysitters or allow J.H. to go to friends' homes for fear of her acting out. (Tr. 177).

In July 2011, Plaintiff completed another Function Report where she noted J.H. constantly made a mess, fought with her siblings, and talked back. (Tr. 202). Plaintiff reported J.H. could care for her personal needs such as bathing and going to the bathroom, but only rarely helped with household chores. (Tr. 202). Plaintiff stated J.H. needed constant attention, would only do something after being told multiple times, and was easily distracted. (Tr. 202-04).

*Education Records*

In September 2010, while at Madison School for the Arts, she was referred to the office four times because she was yelling, hitting other children, throwing things, leaving the room, and not following directions. (Tr. 162-67). She was suspended from September 22-28, 2010 for throwing chairs and being disorderly and non-compliant. (Tr. 169). In October 2010, J.H. was suspended again due to "repeated disruptive, disobedient behavior, unsafe – not following directions." (Tr. 161). Her report card from the school showed she was not satisfactory in almost every category and it was noted her behavior had major effect on her learning. (Tr. 310-11).

3

In April 2011, Meggan Straub, J.H.'s kindergarten teacher at Glenwood Elementary, stated J.H. had not been referred for special education but noted it was her third school in six months. (Tr. 189). Ms. Straub reported J.H. was somewhat below grade in math, reading, and writing, but was at grade level in social studies and science, yet believed she could be academically successful if she continued in school. (Tr. 189-90). She noted J.H. worked much less, behaved somewhat less appropriately, was an average learner, and was slightly less happy than other students her age. (Tr. 190). However, Ms. Straub was concerned about J.H. because she was afraid of "talking walls", she punched herself in the face, and chewed up her worksheets. (Tr. 190). Ms. Straub also described J.H. as having difficulty finishing things, talking out of turn, crying, harming herself, distracting others, having unrealistic fears, being nervous, and being easily frustrated. (Tr. 191-92). In May 2011, J.H.'s report card showed she struggled in reading but was performing at grade level in math. (Tr. 193). However, J.H.'s work habits and social skills were deficient and were one of the reasons she would be held back from first grade. (Tr. 193).

Her 2011-2012 kindergarten progress report from Raymer Elementary showed J.H. had mastered all areas of reading, writing, mathematics, and was developing her skills in science and history. (Tr. 228). She also had satisfactory grades in music, art, and physical education but her communication, social growth, and work habits were all rated as slightly less than satisfactory or unsatisfactory. (Tr. 229). However, J.H. had progressed enough to be promoted to first grade and the comments reported her academics were good and her behavior improving. (Tr. 229).

On September 5, 2012, J.H. was referred to the office for interrupting, shouting, failing to follow directions, and being disrespectful. (Tr. 230). Less than a week later, she was sent back to the office for the same behavior, at this time the school spoke with Plaintiff and discovered J.H.

4

was out of medication. (Tr. 231). The next day, J.H. was again sent to the office for not following directions and soon after, she was suspended for one day. (Tr. 232-33). Her poor behavior continued to result in disciplines throughout the fall of 2012, including another one day suspension and being sent home early from school on multiple occasions. (Tr. 234-47).

*Relevant Medical Evidence*

*Harbor Behavioral Healthcare*

In September 2010, J.H. was assessed at Harbor Behavioral Health by Joan Brendle, P.C., on the recommendation of the school, for concerns of aggression. (Tr. 259). Plaintiff reported J.H. had up to five tantrums a day, was verbally aggressive towards her brother, and physically aggressive towards her baby sister. (Tr. 259, 260). Plaintiff also stated she could not take J.H. into public because she was verbally aggressive, threw and pushed stuff off of counters, touched strangers, and ran away from her. (Tr. 259). On mental status exam, J.H. was hyperactive, with appropriate mood and thought content, logical thought process, and normal speech, judgement, and memory. (Tr. 261). During the session, J.H. wandered around the room, took things off desks, tried to get into files, and crawled into a cabinet and shut the door. (Tr. 262). Ms. Brendle diagnosed J.H. with Disruptive Behavior Disorder and Attention Deficit/Hyperactivity Disorder ("ADHD"). (Tr. 262). She assigned her a Global Assessment of Functioning ("GAF") score of 38.[1]

---

1.The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing in school). *Id.* at 34.

5

On November 30, 2010, J.H. was seen by Dr. Artis at Harbor for a Developmental Pediatric consultation. (Tr. 283). Dr. Artis commented "[J.H.] was not oppositional in the office. She was rather active and restless and responds to redirection." (Tr. 283). Dr. Artis recommended she continue counseling, ordered an EKG, and discussed a possible referral to child psychiatrist if problems persisted. (Tr. 284).

In April 2011, J.H. saw Megan Bodine for academic and developmental testing. (Tr. 285). Ms. Bodine noted J.H. did not have any major difficulties completing the tests, but was hyperactive and needed to be redirected to finish the tests. (Tr. 285). J.H. was found to be in the average or better than average range on both academic tests indicating she did not have a learning disability. (Tr. 286). Other questionnaires completed by Plaintiff and J.H.'s teacher indicated ADHD and anxiety. (Tr. 287). Ms. Bodine recommended continued counseling, medication, tutoring, and more consistent enforcement of rules at home. (Tr. 288). She diagnosed J.H. with ADHD and anxiety disorder and assigned her a GAF score of 52.[2]

On June 11, 2011, J.H. saw Brad Olsen, M.D., for counseling and he reported she was cooperative, had normal speech, congruent affect, anxious mood, logical thoughts, impaired attention and concentration, impulsivity, and self-injurious behavior. (Tr. 292-94). She was prescribed Vynase to treat her ADHD. (Tr. 295). Plaintiff returned a week later because Vynase was not covered by her insurance and Dr. Olsen prescribed Dexedrine instead. (Tr. 296). In August 2011, Plaintiff returned and reported that Dexedrine was not improving J.H.'s behavior, but Dr. Olsen continued Dexedrine at an increased dosage. (Tr. 299-300). When J.H. turned six in September 2011, Dr. Olsen recommended Plaintiff try Vynase since it was now covered by her insurance. (Tr. 306).

---

2. A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)." *Id.* at 34.

A month later, Plaintiff reported the "medication works well for [J.H.]. [She is] not having problems in school with the meds", nor were there any adverse side effects. (Tr. 307). On mental status exam, J.H. was cooperative, with no abnormal movement, normal speech, intact memory, attention, and concentration, logical thoughts, and she denied any self-injurious thoughts. (Tr. 308). Dr. Olsen continued the Vyanse prescription and recommended continued counseling. (Tr. 309). Later, treatment at Harbor ceased due to lack of attendance. (Tr. 325).

*Unison Behavioral Health*

After almost a year without treatment, Plaintiff brought J.H. to Unison Behavioral Health in September 2012 complaining of fighting, hitting, yelling, destructive behavior, and hyperactivity. (Tr. 321). Plaintiff also reported a worsening of behavior after J.H.'s father died including increased anxiety, anger, impulsivity, inattention, and mood swings. (Tr. 326). Her mental status exam showed a moderately withdrawn demeanor, avoidant eye contact, logical thought process, mild hyperactivity, mildly cooperative yet resistant behavior, average intelligence, and no impairment in attention or concentration. (Tr. 330). She was diagnosed with ADHD and oppositional defiant disorder ("ODD"). (Tr. 329). It was concluded J.H. needed symptom management and development of personal skills. (Tr. 327). J.H. was referred for individual counseling and a partial hospitalization program for children. (Tr. 329).

In a follow-up session at Unison, J.H. was found to have organized thought process, depressed mood, cooperative behavior, calm motor activity, and intact memory. (Tr. 331). J.H. was scheduled to begin group therapy October 1, 2012. (Tr. 331). On October 31, 2012, J.H. underwent a psychiatric evaluation with Alamdar Kazmi, M.D., where she was assigned a GAF score of 55 and prescribed Adderall. (Tr. 334-36). In November, J.H. returned three times to Unison with a largely unchanged mental status exams however Plaintiff complained of increased

7

referrals from school, irritability, and crying. (Tr. 333). Plaintiff also reported J.H.'s medication, though effective, wore off by noon and after that her behavioral problems returned. (Tr. 339). Dr. Kazmi increased J.H.'s Adderall dosage. (Tr. 339).

*State Agency Reviewers*

On initial evaluation in May 2011, Robert Klinger, M.D., and Catherine Flynn, Psy.D., found J.H. had no limitations in acquiring and using information, moving about and manipulation of objects, or caring for herself; less than marked limitation in interacting and relating to others and health and physical well-being; marked limitation in attending and completing tasks. (Tr. 72-73). On reconsideration in August 2011, Louis Goorey, M.D., and Aracelis Rivera, Psy.D., concluded J.H. had the same limitations as on initial review except that they found her to have less than marked limitation in caring for herself. (Tr. 82-83).

*ME Testimony and ALJ Decision*

Dr. Moore, the ME, found J.H. had ADHD and ODD but noted she was "awfully young for that diagnosis." (Tr. 53). He analyzed J.H.'s impairments under Listings 112.11 and 112.08 but found she did not meet either of the listings and had less than marked limitations in all six domains. (Tr. 53-54). Dr. Moore qualified his opinion by stating his conclusions were based on her being medicated. (Tr. 54, 58). He noted that J.H. had responded well to medication in the past, and believed once her new doctor found the correct dosage her behavior would improve again. (Tr. 55). He also cited test scores that showed J.H. to be of average intelligence and capable of completing testing even when not medicated. (Tr. 56).

After the hearing, the ALJ rendered a decision and found J.H. was not disabled. (Tr. 12-25). He found J.H. had the severe impairments of ADHD and ODD, but they did not meet or medically equal a listed impairment. (Tr. 15-18). The ALJ further found J.H. had less than

marked limitations in acquiring and using information, attending and completing tasks, interacting and relating to others, caring for herself, and health and well-being; and no limitation in moving and manipulating objects. (Tr. 18-24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). In the case of a claimant

under the age of 18, the Commissioner follows a three-step evaluation process – found at 20 C.F.R. § 416.924(a) – to determine if a claimant is disabled:

1. Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it is a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3. Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine, under step three of the analysis, whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). This approach, called the "whole child" approach, accounts for all the effects of a child's impairments singly and in combination. SSR 09-1P, 2009 WL 396031, at *2. If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. 20 C.F.R. § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). The six functionality domains are: (i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating

objects, (v) caring for yourself, and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

## DISCUSSION

Plaintiff argues the ALJ erred when (1) he concluded J.H. did not have marked impairments in two functional domains such that her impairments functionally met the listing; and (2) he concluded without analysis that J.H. had been non-compliant with treatment. (Doc. 15, at 13-20). Each argument will be addressed in turn.

*Functional Domains*

Preliminarily, Plaintiff argues the ALJ "effectively found 'marked' limitations in two domains" when J.H. was not medicated and thus, he should have found her functionally equivalent to the listing. (Doc. 15, at 13-14). However, this argument fails on a simple premise: the ALJ did not conclude that J.H. was markedly limited in any functional domains. (Tr. 18-24). Further, if Plaintiff is arguing substantial evidence exists to support a finding of marked limitations, this argument is also facially insufficient given the standard of review applied in judicial appeals of disability determinations. That is, even if substantial evidence supports a finding contrary to the ALJ's, this Court still cannot reverse so long as substantial evidence also supports the conclusion reached by the ALJ. *See Jones*, 336 F.3d at 477.

In considering the listing of impairments there is no "heightened articulation standard"; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio 2012) (quoting *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006)). However, the court must find an ALJ's decision contains "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012 WL 568986, at *6 (citing *Reynolds*, 424 Fed. App'x at 415-16); *see also May*, 2011 WL

3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision."). The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 Fed. App'x at 411).

When assessing functional limitations, the ALJ considers myriad relevant factors, including the effects of medication and treatment. 20 C.F.R. § 416.924a(b)(9). *See also* §§ 416.924a, 416.924b, 416.929. The regulations direct the ALJ to examine the information in the child's record about how his or her functioning is affected during performance of all activities when deciding whether the impairment or combination of impairments functionally equals the listings. § 416.926a(b). In making these determinations, an ALJ may rely on ME testimony as substantial evidence if it is based on a review of the entire record. *See Blakely*, 581 F.3d at 408-09.

Plaintiff argues substantial evidence did not support the ALJ's finding that once medicated, J.H.'s potentially "marked" limitations – attending and completing tasks and interacting and relating with others – would improve to such a degree as to be not marked; and would not meet or equal the listings. (Doc. 15, at 13-18). Thus, the Court will undertake an analysis of whether the ALJ had substantial evidence to support his conclusions that J.H. had less than marked limitations in attending and completing tasks and interacting and relating to others. (Tr. 19-21).

*Effects of Medication on Findings of Marked Limitations*

Plaintiff's argument relating to both domains is the same; i.e. that J.H.'s improved behaviors in these two domains while medicated are conclusions based purely on impermissible speculation and are unsupported by the record. (Doc. 15, at 15-17). The ALJ found that if J.H.

12

did not take her medication she would be markedly limited in the attending and completing tasks domain and would "border on marked limitations" in the domain of interacting with others. (Tr. 20-21). But once proper dosage was found J.H.'s behavior would significantly improve and any medication side effects should be reduced or eliminated. (Tr. 20-21). Without more, these conclusions regarding the ameliorative effects of medication would be insufficient; however, after analyzing the entirety of the opinion the ALJ cited to the ME's testimony, Plaintiff's testimony, medical records, IQ testing, and the state agency reviewers' opinions in support of his finding. (Tr. 16-18).

Particularly, the ALJ relied on the ME's testimony that J.H. was not disabled as long as she remains on medication. (Tr. 17, 58). The ME based this testimony in part on the medical records provided by Harbor where both Plaintiff and Dr. Olsen observed improved behavior in J.H. and no side effects while on medication. (Tr. 17, 58, 307). The ME cited to J.H.'s IQ testing which indicated she was of average intelligence and was capable of completing tasks even while not on medication. (Tr. 17, 56, 285-86). The state agency reviewers' concluded J.H. was less than marked in interacting with others and marked in attending and completing tasks; however the ALJ gave the latter opinion less weight because it was given prior to J.H. ever being medicated. (Tr. 18, 72-73, 82-83). The ALJ also noted that Plaintiff's own reports to doctors supported the conclusion that J.H.'s behavioral problems were accounted for when compliant with medication. (Tr. 17-18, 45-46, 58). Lastly, J.H.'s grade cards demonstrated that during the time she was medicated during her 2011-2012 school year, she had improved in both behavior and academics, enough so to be passed on to the first grade. (Tr. 17-18, 228-29).

Plaintiff combats these citations with evidence from the same Harbor records which showed a prior medication, Dexedrine, was unsuccessful at controlling J.H.'s behavior and

13

caused appetite and sleep problems. (Tr. 301). And the current medication, Adderall which J.H. had been on for approximately one month, was unsuccessful at controlling J.H.'s behavior for more than a few hours. (Doc. 15, at 17-18). Further, Plaintiff argues that there is no evidence of sustained improvement in J.H. because she has been on medication for only limited periods of time. (Doc. 15, at 17-18). However, all of this evidence was available for the ME to review and he still concluded J.H. would have a less then marked limitation in these domains, conclusions supported by the record as discussed above. Also, none of the evidence cited by Plaintiff directly contradicts the evidence discussed by the ALJ in his findings.

Plaintiff further alleges ALJ did not take into account that currently J.H.'s medication wears off around noon and thus, leaves a significant portion of the day uncontrolled. (Doc. 15, at 18). Yet, the ME specifically addressed the issue of J.H.'s Adderall dosage and concluded it was likely her doctor wanted to start her off slowly so that she was not over-medicated. (Tr. 55). This conclusion is supported by evidence that Dr. Kazmi had undertaken to increase J.H.'s dosage at her most recent appointment less than a month before the hearing. (Tr. 339). The ME's testimony regarding the anticipated effects of medication on J.H.'s behavior is proper, especially taking into account the record evidence of her past improvements with medication.

It was not inappropriate for the ALJ to rely on the ME's conclusions that the correct medication and dosage would improve J.H.'s behavior. *See Bell v. Comm'r of Soc. Sec.,* 2015 WL 235410, at *9 (S.D. Ohio)(finding ALJ did not err when relying on the ME's opinion that the ameliorative effects of medication, when Plaintiff was compliant, rendered him not disabled.). After a review of the evidence cited and the ME testimony, the Court finds the ALJ had substantial evidence to conclude J.H. had less than marked limitations in both domains.

*Non-Compliance Analysis*

Plaintiff's final argument is the ALJ failed to undertake the proper analysis when he concluded J.H. had failed to follow prescribed treatment. (Doc. 15, at 18-20). When a plaintiff fails to follow prescribed treatment from their treating physician that is expected to remove their disability, she will not be found disabled absent a good reason. 20 C.F.R. § 416.930(b); SSR 09-7p, fn 11, 2009 WL 396029. Plaintiff alleges the reason she did not comply with the prescribed medication is because of the adverse side effects to J.H. (Doc. 15, at 18-20). However, at no point during the hearing or within the record did Plaintiff allege that medication side effects were so severe as to prevent J.H. from taking them. In fact, Plaintiff generally approved of the effect of medication on J.H. except for Dexedrine, which caused sleep and appetite problems. (*See* Tr. 45-46, 58, 301, 339). Further, the "zombie" comment upon which Plaintiff bases her argument was again related to Dexedrine, a medication that was subsequently replaced in favor Vynase and Adderall, medications for which there are no complaints of adverse side effects. (Tr. 308-09, 334, 336).

Rather, it appears J.H.'s non-compliance resulted from Plaintiff's failure to take her to appointments; which is not a justifiable reason for failing to follow treatment. (Tr. 325, 334); *see* SSR 82-59, 1982 WL 31384, at *3-4. Just as the Commissioner is not entitled to *post-hoc* rationales to support an ALJ's findings, likewise Plaintiff cannot profit from them. *Jones v. Comm'r of Soc. Sec.,* 2012 WL 946997, at *8 (N.D.Ohio). Since the issue of whether side effects were the basis of J.H.'s non-compliance was not in front of the ALJ, it is little wonder that he failed to analyze the issue. As such, the ALJ did not err when he determined that Plaintiff did not present a good reason for failing to comply with the prescribed treatment and thus, he was not in error to consider that failure's effect on J.H.'s impairments.

15

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Commissioner's decision denying benefits is affirmed.

IT IS SO ORDERED.

                                                                         s/James R. Knepp, II
                                                                        United States Magistrate